## UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF MISSOURI
## SOUTHEASTERN DIVISION

| | |
|---|---|
| **HERSHEL WILLIAMS,** ) | |
| ) | |
| **Plaintiff,** ) | |
| ) | |
| **v.** ) | **Case number 1:05cv0056 CAS** |
| ) | **TCM** |
| **JO ANNE B. BARNHART,** ) | |
| **Commissioner of Social Security,** ) | |
| ) | |
| **Defendant.** ) | |

## REPORT AND RECOMMENDATION
## OF UNITED STATES MAGISTRATE JUDGE

This is an action under 42 U.S.C. § 405(g) for judicial review of the final decision of

Jo Anne B. Barnhart, the Commissioner of Social Security ("Commissioner"), denying

Hershel Williams disability insurance benefits ("DIB") under Title II of the Social Security

Act ("the Act"), 42 U.S.C. §§ 401-433, and supplemental security income benefits ("SSI")

under Title XVI of the Act, 42 U.S.C. §§ 1381-1383b. Plaintiff has filed a brief in support

of his complaint; the Commissioner has filed a brief in support of her answer. The case was

referred to the undersigned United States Magistrate Judge for a review and recommended

disposition pursuant to 28 U.S.C. § 636(b).

### Procedural History

Hershel Williams ("Plaintiff") applied for DIB and SSI in November 2003, alleging

he was disabled as a result of upper and lower back pain and problems with his legs and

arms.  (R. at 55-57, 206-07.)[1]  In the DIB application, he alleged he had been disabled since November 4, 2001; in the SSI application, he alleged a disability onset date of November 13, 1997.  (Id.)  These applications were denied initially and after a hearing before Administrative Law Judge ("ALJ") Richard P. Laverdue.  (Id. at 13-18, 20, 26-29, 208-12, 215-48.) The Appeals Council then denied Plaintiff's request for review, effectively adopting the ALJ's decision as the final decision of the Commissioner.  (Id. at 5-7.)

### Testimony Before the ALJ

Plaintiff, represented by counsel, and Gary Weimholt, M.S., testified at the administrative hearing.

Plaintiff testified that he was then 53 years old[2] and had completed the twelfth grade. (Id. at 225.)  Having returned in December 2001 to Missouri from Texas, he lived with, and cared for, his ill mother.  (Id. at 231, 232, 236.)

In 1997, Plaintiff had vocational training at a community college to be a computer technician and operator.  (Id. at 225.)  He obtained this training after injuring his back at work in Texas.  (Id. at 226-27.)  After the injury, he was unable to return to his job as a backhoe operator.  (Id. at 227.)  He has called[3] to see if there is any work available and has

---

[1]References to "R." are to the administrative record filed by the Commissioner with her answer.

[2]Plaintiff was born on March 19, 1947.

[3]The name of who or what he called was inaudible.

been told there is not.  (Id. at 236.)  He had applied for work at a company in St. Louis, but he never heard back.  (Id. at 237.)

Plaintiff explained that he could not work because his feet swelled and he has a pinched nerve.  (Id. at 226.)  He sees a chiropractor every two weeks.  (Id.)  The chiropractor has explained that Plaintiff has a pinched nerve and his spine needed to be readjusted.  (Id. at 227.)  He can afford the chiropractic treatment because workers' compensation is paying for it.  (Id. at 228.)  He is supposed to consult a neurologist, but the only one approved is approximately 200 miles away.  (Id.)  His chiropractor has not diagnosed his problem with his feet.  (Id. at 233.)  He has been told to elevate his feet and to see a dietician.  (Id.)  He does not have the money to see one.  (Id.)  His sugar count goes up and down; he tries to keep a piece of candy with him.  (Id. at 233-34.)  He also has problems with his stomach; it feels like someone just hit him.  (Id. at 235.)  His chiropractor is to take x-rays.  (Id.)

Plaintiff further testified that he could sit comfortably in a chair for only fifteen minutes.  (Id. at 228.)  Back pain also affected his ability to bend over and stand up.  (Id. at 229.)  When driving his mother to and from the doctor, a journey of approximately 36 miles each way, his back would hurt from having to sit too long.  (Id. at 231-32.)  He could walk for only one-quarter of a mile before his feet started burning.  (Id. at 229.)  He could pick up only 25 pounds, but used to be able to pick up 40 pounds.  (Id. at 230.)  He could lift 25 pounds a few times a day, but not all day.  (Id.)  He also has difficulty climbing stairs, and often must use the handrails.  (Id.)

He did not use an assistive device, nor did he take medication.  (Id. at 230.)  He was on medication – Flexeril and Hydrocodone – when he lived in Texas; however, his chiropractor did not believe in medication.  (Id. at 231.)  He had to be weaned off the Hydrocodone.  (Id.)

Plaintiff had no health insurance and did not qualify for Medicaid.  (Id. at 232.)

Plaintiff described his daily activities as including a walk in the front and back yards, after which he returned to the house and sat.  (Id. at 233.)  He alternated sitting and standing and tried to keep moving.  (Id.)  He had tried to do exercises given to him in Texas; however, he had to stop when his feet began to swell.  (Id.)  When he does exercise, he does so for approximately 15 minutes.  (Id. at 234.)  He does laundry, but makes sure it is a light load.  (Id.)  He vacuums when he feels able to do so, which was everyday.  (Id. at 235.)  His three sisters also live with his mother, and they do the other chores.  (Id.)  He does not engage in any social activities.  (Id. at 234.)

Gary Weimholt testified as a vocational expert ("VE").  (Id. at 237.)  He described the skill and exertional level and the corresponding title number in the Dictionary of Occupational Titles ("DOT") of the various jobs Plaintiff had held, including that of a gate guard and of an electronics technician, or micro-computer support specialist.  (Id. at 239-42.)  Both were considered light work.  (Id. at 239, 242.)  The VE was then asked the following:

> [A]ssume someone of the Claimant's age, education, and experience.  Further assume capacity for – exertionally, for medium-level work that would permit alternating sitting and standing at will during the workday.  Would any of the Claimant's past jobs be performable – well, as they're customarily or as he performed them [INAUDIBLE] his testimony as he performed them.

- 4 -

(Id. at 243-44.) (First alteration added.)  The VE answered that the jobs of gate guard and computer technician, as Plaintiff had performed it, would satisfy the ALJ's criteria.  (Id. at 244-45.)  If the computer service work had an exertional level of light and allowed alternate sitting and standing, it could be performed as it was customarily done.  (Id. at 245-46.)

## Medical and Other Records Before the ALJ

The documentary record before the ALJ included forms Plaintiff completed as part of the application process, documents generated pursuant to those applications, records from various health care providers, and reports of an evaluation.

When applying for DIB and SSI in June 2003,[4] Plaintiff completed a Disability Report, listing November 4, 2001, as the date when he had become unable to work because of his impairments.  (Id. at 77.)  He had, however, worked after that date; his impairments had caused him to change his job duties.  (Id. at 77-78.)  Workers' compensation would not let him return to his "old job."  (Id. at 78.)  He had stopped working because he had been laid off.  (Id. at 78, 85.)  At an interview when applying for benefits, Plaintiff was described as having difficulty with walking and with swollen ankles.  (Id. at 93.)

Plaintiff also then completed a Work History Report.  (Id. at 95-102.)  He listed seven jobs, the last was as a computer technician and was from 1998 to 2001.  (Id. at 95.)  When working as a security job, Plaintiff spent equal time sitting, walking, and standing.  (Id. at 97.)  The heaviest weight he occasionally lifted was ten pounds; he frequently lifted less than that.  (Id.)  Although he did not list the specific weight requirements for his job as a computer

---

[4]These applications were denied in August 2003.  (Id. at 19, 21-25, 200-05.)

technician, he did report that the job required a lot of walking, bending, standing, and sitting. (Id. at 102.) He separately reported that he had no problem with personnel grooming, including showering. (Id. at 103.) He walked daily for exercise; however, his feet swelled and burned afterwards. (Id.)

When applying in November 2003, Plaintiff listed November 13, 1997, as the date when his impairments first bothered him. (Id. at 106.) At an interview when applying for benefits, Plaintiff was not described as having any difficulty with walking or with swollen ankles. (Id. at 123.) On a separate form, he reported having pain if he walked, stood, or sat for too long. (Id. at 125.) His arms were weak. (Id. at 127.) It took him a long time to bathe and get dressed; he had problems putting on his shoes. (Id. at 128.) He spent most of his day sitting or laying down. (Id.) He could sit for one hour at a time. (Id.) Three months later, Plaintiff reported that he had trouble with bathing and other personal needs. (Id. at 130.) He had trouble sleeping because he could not get comfortable. (Id.) He was not taking any medications. (Id. at 132.) Two months later, after requesting a hearing, he reported that it took him longer to put on his clothes and to bathe. (Id. at 135.) His chiropractor told him to keep his feet elevated two or three times a day. (Id. at 139.)

A report from the Texas Workers' Compensation Commission lists November 13, 1997, as the date when Plaintiff injured his back after falling backwards. (Id. at 70.) He was expected to return to work on November 19. (Id.) He did not. Instead, he was paid temporary disability benefits until October 27, 1998. (Id. at 71.)

Plaintiff's earliest medical record relates to his work injury on November 13, 1997. (Id. at 143-50.)  X-rays revealed decreased height at L2-3 and spurring at L2 and L3.  (Id. at 143.)  He had positive signs of sacroiliac joint dysfunction and also possibly had spondylosis at L2.  (Id.)  A computed tomography ("CT") scan showed "marked narrowing and air vacuum phenomenon at L2-3" with disc bulging and a possible disc herniation at L1-2. (Id.)  After chiropractic treatment, physical therapy, and work hardening, Plaintiff "improved dramatically."  (Id.)  It was expected that he would have some permanent restrictions, specifically, work with a medium physical demand level.  (Id.)  James Cable, M.D., of the Texas Back Institute assessed Plaintiff's impairment as a result of his injury as 10% of the person as a whole.  (Id. at 144.)

On April 29, 2002, Plaintiff consulted Gregorio Rodriquez, M.D., about swelling in his feet.  (Id. at 196.)  He had no chest pain and no shortness of breath.  (Id.)  Dr. Rodriquez advised Plaintiff to stop smoking.  (Id.)  One month later, he scheduled an appointment for Plaintiff with a dietician.  (Id.)  Plaintiff did not keep the appointment.  (Id. at 197.)

Plaintiff's remaining medical records are those of his chiropractic treatment by Robert Kessinger, D.C.  (Id. at 158-92.)

Plaintiff first consulted Dr. Kessinger on November 11, 2003.  (Id. at 161-69.)  He listed his current impairments as diabetes, arthritis, migraines, sinus problems, dizziness, allergies, numbness, tingling, and back problems.  (Id. at 162.)  His current complaints were headaches; loss of concentration and memory; sensitivity of eyes to light; loss of balance, smell, and taste; dizziness; neck pain, stiffness, and restricted range of motion; upper,

middle, and low back pain; shoulder, arm, and leg pain; sinus trouble; nervousness; feelings of pins and needles in his legs; vision problems; chest pain; shortness of breath; irritability; numbness in his feet and hands; anxiety; depression; insomnia; fatigue; nausea; swelling in his feet, ankles, and legs; bruises; and jaw pain. (Id.) He had headaches twice a year; dizziness constantly; chest pain daily; and difficulty breathing frequently. (Id. at 169.) He had sought medical treatment in the past year for his swollen feet; however, he did not return to find out the test results. (Id. at 163.) His impairments did not cause him any difficulty in such activities as hearing, speaking, listening, reading, writing, or using a keyboard. (Id. at 165.) He was able to attend to some activities of personal grooming, e.g., washing his face and brushing his teeth, without pain but not others, e.g., putting on or tying his shoes. (Id.) Some household chores he could do "without much difficulty, despite some pain," e.g., preparing meals, cleaning dishes, or doing laundry, while other chores were more difficult, e.g., taking out the trash. (Id.) He could sit for long periods despite some pain, but had marked pain when walking. (Id.) He could stand for only 30 minutes and walk for only one-half mile because of his pain. (Id. at 166.) He described the intensity of his pain as moderate and the frequency as constant. (Id. at 167.) He took no medication. (Id.) He could not sleep because of his pain. (Id. at 168.)

At his initial visit to Dr. Kessinger, Plaintiff underwent a "MyoVision WinScan98 Exam." (Id. at 189.) This "computerized" exam was "used to evaluate the relative levels of electrical activity associated with Vertebral Subluxation" and, consequently, "assist the Chiropractor in determining which areas/levels of the nervous system are being adversely

affected by Vertebral Subluxations." (Id.) Plaintiff had high levels of muscle tension in his cervical, thoracic, and lumbar spine. (Id.) These levels were reportedly associated with subluxation. (Id.)

Plaintiff saw Dr. Kessinger 20 times between November 11, 2003, and February 18, 2004. (Id. at 158-60.) Each time, Dr. Kessinger reported Plaintiff's complaints, including consistent complaints of back pain, numbness, stiff neck, weak legs or knee, and trouble sleeping. (Id.) Plaintiff twice complained of chest pain. (Id.) Nineteen of the twenty times Plaintiff was treated with an adjustment. (Id. at 170.) On December 1, 2003, his shoulder abduction, elbow flexion, and wrist flexion and extension were tested. (Id. at 181-83, 185.[5]) On December 19, Plaintiff's knee flexion, hip flexion, and foot inversion and eversion were tested. (Id. at 177-80.)

Pursuant to his first DIB and SSI applications, see page 5 above, Plaintiff was evaluated by Lori A. Moyers, D.O., on July 22, 2003. (Id. at 150-55.) Plaintiff reported to Dr. Moyers that his back pain had become progressively worse since he was laid off in September 2001. (Id. at 150.) He stated that his feet itched; he had "abnormal sensations under his fingernails and toenails"; his feet swelled with walking; and his left knee became stiff and swollen if he sat longer than two hours. (Id.) He could no longer wear shoes, and had to keep his feet elevated. (Id.) He had had no diagnosis to explain the swelling. (Id. at 150-51.) His medications were Flexeril and Hydrocodone; his past medical history was chronic low back pain. (Id. at 151.) He smoked one and one-half packs of cigarettes a day.

_____

[5]Pages 184, 187, and 190 to 192, inclusive, are duplicates of the tests on December 1.

(Id.)  He lived alone, and cooked, vacuumed, did the laundry, and washed dishes.  (Id.)  He did not visit family or friends, but did have hobbies of reading and working on the computer.  (Id.)  His daily activities began with a shower at 8:00 a.m., breakfast at 9:00 a.m., sitting from 10:00 a.m. to 1:00 p.m., walking until 3:00 p.m., sitting to 5:00 p.m., a nap until 8:00 p.m., watching television until 10:00 p.m., and bed.  (Id.)  He further reported that his hand grips were strong; he did not drop objects.  (Id.)  He had swelling in both ankles and in the right knee.  (Id.)  He could lift 60 to 65 pounds; he could sit or stand for three hours; and he could walk a mile and did not need an assistive device.  (Id. at 151-52.)  He suffered from headaches that made his neck, shoulder, and head muscles feel tight and painful and his vision worse.  (Id. at 152.)  On examination, his cranial nerves were intact; his Rhomberg sign was negative.  (Id.)  He had no gross anomalies of his spinal curvature, had no muscle spasms in his paravertebral muscles, and had normal muscle mass without atrophy.  (Id.)  His gait, including his ability to walk heel to toe, was normal.  (Id. at 153.)  His range of motion in his shoulders, elbows, wrists, hips, knees, and cervical and lumbar spine was normal.  (Id.)  He had marked swelling in his ankles.  (Id.)  He could make a fist, and his grip and upper and lower extremity strength were all 5/5.  (Id.)  His straight leg raising was negative at 90 degrees.  (Id.)  Dr. Moyers' impression was of chronic low back pain status post lumbar spine injury with residual paresthesias and knee swelling and stiffness.  (Id.)  She concluded as follows:

> [Plaintiff] appeared to be doing well until his job ended in 2001.  He complains of chronic lower extremity edema however he has been sitting in our office for two hours today and I don't appreciate any significant edema of

his bilateral lower extremities. No difficulty wearing shoes is noted today. He states he has trouble being in a position for a long period, however he has recorded he can stand 3 hours, sit 3 hours, and walk a mile. He had no difficulty with fine motor manipulation. Gait was normal in heel, toe, tandem, and normal. I appreciated no significant neurologic abnormalities, muscle atrophy, muscle spasm, or tenderness. No abnormality of gait and station. He did not use any assistive devices for ambulation. I believe his ability to perform work related functions such as sitting is unlimited. Standing is limited to 6 hours a day. Walking, lifting, carrying, limited to 6 hours a day. Handling objects, unlimited. Hearing, speaking, and traveling are unlimited.

(Id.) (Alteration added.)

## The ALJ's Decision

After reviewing the records of Drs. Cable, Rodriquez, Moyers, and Kessinger, the ALJ characterized Dr. Kessinger's narrative records as "a reiteration of [Plaintiff's] subjective complaints and self-estimates of ability to function in various capacities. This is inferred from Dr. Kessinger's consistent reference to what [Plaintiff] *stated* with regard to the area of assessment being considered." (Id. at 15.) (Alterations added.) The ALJ also noted that "the record contains no medical source statements or opinions regarding [Plaintiff's] residual functional capacity, aside from that of the consultative physician, Dr. Moyers." (Id.) (Alteration added.)

The ALJ then found that Plaintiff had severe impairments of chronic low back pain, status post L1-L2-L3 injury, and a herniated disc; however, these impairments did not meet or equal Listing-level severity. (Id.) He found the evidence of depression to be insufficient. (Id.)

The ALJ next considered whether Plaintiff retained the residual functional capacity ("RFC") to perform past relevant work and, if not, whether there were jobs in the national or regional economies that he could perform. (Id.) A factor in this consideration was Plaintiff's subjective complaints. (Id.) The ALJ found such complaints to be only partially credible. (Id.) Specifically, he found that Plaintiff's testimony about the intensity, persistence, and limiting effects of his impairments to be "somewhat exaggerated." (Id.) Plaintiff 's daily activities, including his statement that he could stand or sit for three hours and engaged in such hobbies as reading and working on the computer, required capabilities similar to those required to maintain employment. (Id. at 15-16.) Also, Plaintiff's description of his pain and the resulting limitations was inconsistent with his lack of pain killers or prescription medication. (Id. at 16.) And, Plaintiff returned to work after his initial injury and stopped working at a different job which he was subsequently trained for only because he was laid off. (Id.)

After also noting Plaintiff's claim that he lacked the funds to seek medical attention for his problems, the ALJ accorded Plaintiff some benefit of the doubt, disagreed with Dr. Moyers' opinion that Plaintiff's impairments were not severe, and concluded that Plaintiff retained the RFC for medium exertional work with a sit/stand option. (Id.) He then found the opinion of Dr. Kessinger to be more persuasive, but did not accord that opinion controlling weight because Dr. Kessinger was a chiropractor. (Id.) Summarizing the VE's testimony about Plaintiff's previous jobs, the ALJ noted that the VE had testified that a person with limitations similar to Plaintiff's could return to Plaintiff's past relevant work as

a gate guard or as a micro-computer support specialist. (Id. at 17.) The ALJ found this testimony to be credible. (Id.)

Because Plaintiff retained the RFC to return to past relevant work, he was not disabled as defined in the Act. (Id. at 18.)

## Legal Standards

Under the Social Security Act, the Commissioner shall find a person disabled if the claimant is "unable to engage in any substantial activity by reason of any medically determinable physical or mental impairment," which must last for a continuous period of at least twelve months or be expected to result in death. 42 U.S.C. § 1382c(a)(3)(A). The impairment suffered must be "of such severity that [the claimant] is not only unable to do his previous work, but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy." 42 U.S.C. § 1382c(a)(3)(B).

The Commissioner has established a five-step process for determining whether a person is disabled. See 20 C.F.R. § 404.1520. See also **Johnson v. Barnhart**, 390 F.3d 1067, 1070 (8th Cir. 2004); **Ramirez v. Barnhart**, 292 F.3d 576, 580 (8th Cir. 2002); **Pearsall v. Massanari**, 274 F.3d 1211, 1217 (8th Cir. 2002). First, the claimant cannot be presently engaged in "substantial gainful activity." See 20 C.F.R. § 404.1520(b). Second, the claimant must have a severe impairment. See 20 C.F.R. § 404.1520(c). The Social Security Act defines "severe impairment" as "any impairment or combination of impairments which significantly limits [claimant's] physical or mental ability to do basic work

activities . . ." Id. (alteration added). "The sequential evaluation process may be terminated at step two only when the claimant's impairment or combination of impairments would have no more than a minimal impact on h[is] ability to work." **Caviness v. Massanari**, 250 F.3d 603, 605 (8th Cir. 2001) (alteration added).

At the third step in the sequential evaluation process, the ALJ must determine whether the claimant has a severe impairment which meets or equals one of the impairments listed in the regulations and whether such impairment meets the twelve-month durational requirement. See 20 C.F.R. § 404.1520(d), and Part 404, Subpart P, Appendix 1. If the claimant meets this requirement, he is presumed to be disabled and is entitled to benefits. **Warren v. Shalala**, 29 F.3d 1287, 1290 (8th Cir. 1994).

At the fourth step, the ALJ will "review [claimant's] residual functional capacity ["RFC"] and the physical and mental demands of the work [claimant has] done in the past." 20 C.F.R. §§ 404.1520(e) and 416.920(e). "[RFC] is what the claimant is able to do despite limitations caused by all the claimant's impairments." **Lowe v. Apfel**, 226 F.3d 969, 972 (8th Cir. 2000) (citing 20 C.F.R. § 404.1545(a)) (alteration added). "[RFC] 'is not the ability merely to lift weights occasionally in a doctor's office; it is the ability to perform the requisite physical acts day in and day out, in the sometimes competitive and stressful conditions in which real people work in the real world.'" **Ingram v. Chater**, 107 F.3d 598, 604 (8th Cir. 1997) (quoting McCoy v. Schweiker, 683 F.2d 1138, 1147 (8th Cir. 1982) (en banc)) (alteration added). Moreover, "[RFC] is a determination based upon all the record evidence[,]" not only medical evidence. **Dykes v. Apfel**, 223 F.3d 865, 866-67 (8th Cir.

2000) (alterations added).  Some medical evidence must be included in the record to support an ALJ's RFC holding.  **Id.** at 867.  "The need for medical evidence, however, does not require the [Commissioner] to produce additional evidence not already within the record. '[A]n ALJ is permitted to issue a decision without obtaining additional medical evidence so long as other evidence in the record provides a sufficient basis for the ALJ's decision.'" **Howard v. Massanari**, 255 F.3d 577, 581 (8th Cir. 2001) (quoting Frankl v. Shalala, 47 F.3d 935, 937-38 (8th Cir. 1995)) (alterations in original).

     In determining a claimant's RFC, the ALJ must evaluate the claimant's credibility. **Ramirez**, 292 F.3d at 580-81; **Pearsall**, 274 F.3d at 1217.  This evaluation requires that the ALJ consider "(1) a claimant's daily activities, (2) the duration, frequency, and intensity of pain, (3) precipitating and aggravating factors, (4) dosage, effectiveness, and side effects of medication, and (5) residual functions."  **Ramirez**, 292 F.3d at 581 (citing Polaski v. Heckler, 739 F.2d  1320, 1322 (8th Cir. 1984) (subsequent history omitted)).  Although an ALJ may not disregard subjective complaints of pain based only on a lack of objective medical evidence fully supporting such complaints, "an ALJ is entitled to make a factual determination that a Claimant's subjective pain complaints are not credible in light of objective medical evidence to the contrary."  **Id.**  See also **McKinney v. Apfel**, 228 F.3d 860, 864 (8th Cir. 2000) ("An ALJ may undertake a credibility analysis when the medical evidence regarding a claimant's disability is inconsistent.").  After considering the Polaski factors, the ALJ must make express credibility determinations and set forth the inconsistencies in the record which caused the ALJ to reject the claimant's complaints.  See

**Singh v. Apfel**, 222 F.3d 448, 452 (8th Cir. 2000) (same); **Beckley v. Apfel**, 152 F.3d 1056, 1059 (8th Cir. 1998) (same).

The burden at step four remains with the claimant.  See **Banks v. Massanari**, 258 F.3d 820, 824 (8th Cir. 2001); **Singh**, 222 F.3d at 451.  "It is the claimant's burden, and not the Social Security Commissioner's burden, to prove the claimant's RFC."  **Pearsall**, 274 F.3d at 1217.

If the ALJ holds at step four of the process that a claimant cannot return to past relevant work the burden shifts at step five to the Commissioner to establish that the claimant maintains the RFC to perform a significant number of jobs within the national economy. **Banks**, 258 F.3d at 824.  See also 20 C.F.R. § 404.1520(f).  The Commissioner may meet her burden by eliciting testimony by a VE.  **Pearsall**, 274 F.3d at 1219.  If the claimant is prevented by his impairment from doing any other work, the ALJ will find the claimant to be disabled.

The ALJ's decision whether a person is disabled under the standards set forth above is conclusive upon this Court if it is supported by "substantial evidence on the record as a whole."  **Dunahoo v. Apfel**, 241 F.3d 1033, 1037 (8th Cir. 2001); **Clark v. Apfel**, 141 F.3d 1253, 1255 (8th Cir. 1998); **Frankl**, 47 F.3d at 937.  "Substantial evidence is less than a preponderance but is enough that a reasonable mind would find it adequate to support the decision."  **Strongson v. Barnhart**, 361 F.3d 1066, 1069-70 (8th Cir. 2004) (interim quotations omitted).  When reviewing the record to determine whether the Commissioner's decision is supported by substantial evidence, however, the court must also take into account

whatever in the record fairly detracts from that decision. **Warburton v. Apfel**, 188 F.3d 1047, 1050 (8th Cir. 1999); **Baker v. Apfel**, 159 F.3d 1140, 1144 (8th Cir. 1998). The court may not reverse that decision merely because substantial evidence would also support an opposite conclusion, **Dunahoo**, 241 F.3d at 1037, or it "might have decided the case differently," **Strongson**, 361 F.3d at 1070. Thus, if "it is possible to draw two inconsistent positions from the evidence and one of those positions represents the agency's findings, the [Court] must affirm the agency's decision." **Wheeler v. Apfel**, 244 F.3d 891, 894-95 (8th Cir. 2000) (alteration added).

## Discussion

Plaintiff argues that the ALJ (a) erroneously evaluated his credibility; (b) improperly failed to order a consultative examination to evaluate his complaints of foot pain and swelling[6]; and (c) made fatal procedural errors. The Commissioner disagrees.

Plaintiff's Subjective Complaints. As noted above, when evaluating a claimant's RFC, the ALJ must consider, inter alia, the claimant's own descriptions of his limitations. **Pearsall**, 274 F.3d at 1217. Consequently, the ALJ must evaluate the claimant's credibility. **Id.** at 1218. "'Where adequately explained and supported, credibility findings are for the ALJ to make.'" **Ellis v. Barnhart**, 392 F.3d 988, 996 (8th Cir. 2005) (quoting Lowe, 226 F.3d at 972). As noted by the Commissioner, however, "[t]he ALJ need not explicitly discuss each Polaski factor." **Strongson**, 361 F.3d at 1072 (alteration added). "It is

---

[6]This argument was included in Plaintiff's brief with her first but will be separately addressed here.

sufficient if he acknowledges and considers those factors before discounting a claimant's subjective complaints." **Id.** Accord **Lowe**, 226 F.3d at 972.

In the instant case, after summarizing the medical evidence, the ALJ considered Plaintiff's subjective complaints and discounted them based on several Polaski factors, including the lack of supporting objective evidence, the lack of an opinion by a physician that he was disabled, and the lack of any restrictions that would preclude the relevant work activity. These are proper considerations. See **Hutton v. Apfel**, 175 F.3d 651, 655 (8th Cir. 1999) (lack of physical restrictions placed on claimant by physician militated against finding of total disability); **Jones v. Callahan**, 122 F.3d 1148, 1152 (8th Cir. 1997) (subjective complaints of pain were properly discounted on grounds that, inter alia, they were inconsistent with absence of medically ordered commensurate restrictions on claimant's activities); **Shelton v. Chater**, 87 F.3d 992, 996 (8th Cir. 1996) (record supported statements concerning pain as a general matter but not to severity and degree of which claimant complained; recommendations of doctors were devoid of any restrictions and were of conservative treatment; and limited activities were result of lifestyle choices, not medically necessitated limitations); **Stephens v. Shalala**, 50 F.3d 538, 541 (8th Cir. 1995) (lack of objective findings to support pain is strong evidence of lack of a severe impairment); **Barrett v. Shalala**, 38 F.3d 1019, 1022 (8th Cir. 1994) (holding that the ALJ was entitled to find that the absence of an objective medical basis to support claimant's subjective complaints was an important factor in evaluating the credibility of her testimony and of her complaints). The ALJ also properly considered Plaintiff's failure to take strong pain medication. See

**Masterson v. Barnhart**, 363 F.3d 731, 739 (8th Cir. 2004).  When Plaintiff did take pain medication and received treatment, he improved "dramatically." (R. at 143.) Positive results of treatment undercut complaints of disabling pain.  **Rankin v. Apfel**, 195 F.3d 427, 429 (8th Cir. 1999).

Plaintiff testified, however, that his failure to seek treatment was a reflection of his lack of money.  "If a claimant truly has no access to health care, then the absence of such care would not tend to disprove [his] subject complaints of pain."  **Harris v. Barnhart**, 356 F.3d 926, 930 (8th Cir. 2004) (alteration added).  "But in evaluating the credibility of [a claimant's] subjective complaints, it [is] permissible for the ALJ to consider the lack of evidence that [the claimant] had sought out stronger pain treatment available to indigents."  **Id.** (alterations added).  Accord **Goff v. Barnhart**, 421 F.3d 785, 793 (8th Cir. 2005); **Riggins v. Apfel**, 177 F.3d 689, 693 (8th Cir. 1999).  There was no evidence that Plaintiff had requested but been denied health care due to his indigency.  Indeed, the record reflects that Plaintiff simply did not keep an appointment Dr. Rodriquez scheduled for him with a dietician, did not return for test results, and did not seek medical care when he was employed.[7]  Additionally, the undersigned notes that Plaintiff smoked one and one-half packs of cigarettes a day.  In **Riggins**, 177 F.3d at 693, the Eighth Circuit Court of Appeals rejected the lack of money as an explanation for the absence of medical treatment or prescription

---

[7]Plaintiff was last treated by Dr. Cable on March 31, 1998, and was next treated in April 2002 by Dr. Rodriquez.  He was, however, employed until September 2001 and testified that his back problems had persisted since 1997.

medicine on the grounds that there was no evidence to suggest that the claimant had "sought any treatment offered to indigents or chose to forego smoking three packs of cigarettes a day to help finance pain medication."

Another proper consideration when evaluating Plaintiff's credibility was the reason why he stopped working. Plaintiff testified he had been laid-off. "Courts have found it relevant to credibility when a claimant leaves work for reasons other than [his] medical condition." **Goff**, 421 F.3d at 793 (alteration added). Plaintiff also testified that he had sought work after returning to Missouri, one month after his latest disability onset date. This activity is inconsistent with complaints of disabling pain. **Dunahoo**, 241 F.3d at 1038. Additionally, in his July 2003 DIB and SSI applications and in his November 2003 SSI application, Plaintiff alleged a disability onset date of November 1997. He did not stop working until September 2001. A return to work after a disability onset date undercuts complaints of being unable to work. **Ostronski v. Chater**, 94 F.3d 413, 418 (8th Cir. 1996).

Plaintiff correctly notes that his good work history militates in favor of his credibility. See **Black v. Apfel**, 143 F.3d 383, 387 (8th Cir. 1998). This is offset, however, by other factors, including the fact that he was laid off from his last job and that he continued to seek employment. **Id.**

The ALJ further found that Plaintiff's daily activities contradicted his subjective complaints. There is some support in the record for this finding. Although Plaintiff's testimony about his activities described restricted activities, including an inability to sit for longer than fifteen minutes and the necessity of having his family members with whom he

lived do most of the household chores, his report to Dr. Moyers described a more active lifestyle, including sitting for periods of three hours, walking for two hours, and living by and caring for himself. Moreover, an "ALJ [is] not obligated to accept all of [a claimant's] assertions concerning" limitations of daily activities. **Ostronski**, 94 F.3d at 418-19 (alterations added).

Plaintiff additionally argues that the statements of Dr. Kessinger support his subjective complaints. Dr. Kessinger is a chiropractor. "Under the regulations, chiropractors are not considered 'acceptable medical sources.'" **Ingram**, 107 F.3d at 606 n.4 (citing 20 C.F.R. § 404.1513(a)). Consequently, his medical opinion is not to be accorded controlling weight. See **Tindell v. Barnhart**, 444 F.3d 1002, 1005 (8th Cir. 2006). Thus, in considering Dr. Kessinger's evidence and determining its weight, the ALJ had "'more discretion' and was 'permitted to consider any inconsistencies found within the record.'" **Id.** (quoting Raney v. Barnhart, 396 F.3d 1007, 1010 (8th Cir. 2005)). Dr. Kessinger's opinion was entitled, however, to consideration. See **Id.** See also **Raney**, 396 F.3d at 1010 (noting that assessment of therapist, also not an acceptable medical source, was properly considered as "other medical evidence"). As noted by the ALJ, Dr. Kessinger's notes are simply a report of Plaintiff's subjective complaints. The ALJ did not err in consequently decreasing the weight given the notes. See **Brown v. Chater**, 87 F.3d 963, 964 (8th Cir. 1996) (permitting ALJ to discount health care provider's statement as to claimant's limitations because such conclusion apparently rested solely on claimant's complaints); **Woolf v. Shalala**, 3 F.3d 1210, 1214 (8th Cir. 1993) (finding that ALJ could discount conclusory statement of

disability based on claimant's subjective complaints).

For the foregoing reasons, the ALJ properly evaluated Plaintiff's credibility.[8]

Consultative Examination.  "[I]t is the duty of the ALJ to fully and fairly develop the record, even when, as in this case, the claimant is represented by counsel." **Nevland v. Apfel**, 204 F.3d 853, 857 (8th Cir. 2000) (alteration added).  Accord **Snead v. Barnhart**, 360 F.3d 834, 838 (8th Cir. 2004); **Weber v. Barnhart**, 348 F.3d 723, 725 (8th Cir. 2003). This duty arises "[b]ecause the social security disability hearing is non-adversarial . . . [and] the ALJ's duty to develop the record exists independent of the claimant's burden in the case." **Stormo v. Barnhart**, 377 F.3d 801, 806 (8th Cir. 2004) (alterations added).  Also, this duty requires that the ALJ neutrally develop the facts, **id.**, recontacting medical sources and ordering consultative examinations if "the available evidence does not provide an adequate basis for determining the merits of the disability claim," **Sultan v. Barnhart**, 368 F.3d 857, 863 (8th Cir. 2004).  See also **Haley v. Massanari**, 258 F.3d 742, 749 (8th Cir. 2001) (holding that ALJ's duty to develop the record includes ordering a consultative examination when such an examination is necessary for the ALJ to make an informed decision); **Barrett v. Shalala**, 38 F.3d 1019, 1023 (8th Cir. 1994) ("The ALJ is required to order medical examinations and tests only if the medial records presented to him do not give sufficient medical evidence to determine whether the claimant is disabled."); 20 C.F.R. § 416.917

---

[8]Plaintiff also briefly argues that the ALJ merely mimicked the opinion of the counselor when determining his RFC.  The Commissioner correctly notes that this argument is not supported by the record.

(setting forth criteria for when a consultative examination will be provided at Government expense).

Plaintiff argues that the ALJ erred by not ordering a consultative examination to evaluate his feet. There is no error.

Plaintiff sought treatment once for his feet. In April 2002, he consulted Dr. Rodriquez, who advised Plaintiff to stop smoking and consult a dietician. Plaintiff did neither. His sessions with Dr. Kessinger focus on aligning his spine. When evaluated by Dr. Moyers, Plaintiff had a normal gait, did not need an assistive device for walking,[9] could wear shoes, could walk a mile, and had no significant swelling in his feet although he had been sitting for two hours prior to the examination.

The evidence of Plaintiff's feet pain and swelling was adequate for the ALJ to make an informed decision.

Procedural Errors. Plaintiff next argues that the hearing had fatal procedural errors, specifically, neither he nor the VE were sworn in and the transcript contained too many portions which were inaudible.

The first contention lacks factual support. The transcript of the hearing describes Plaintiff as "having been first duly sworn" before his testimony began. (R. at 221.) Similarly, before the VE testified, he also was described as "having been duly sworn." (Id. at 237.)

---

[9]There is also no evidence that Plaintiff needed an assistive device at or after the hearing.

In support of his second contention, Plaintiff notes that the SSA manual requires that the ALJ prepare a summary of any missing testimony and argues that a remand is necessary. (Pl. Mem. at 9-10.) The Eighth Circuit Court of Appeals requires a remand if the inaudible portions "would bolster [claimant's] arguments or prevent judicial review." **Williams v. Barnhart**, 289 F.3d 556, 557-58 (8th Cir. 2002) (alteration added).

The 30 pages of testimony included 46 "inaudibles." The context of these clearly indicate that the majority of them replaced only one or two words. For instance, an "inaudible" replaced the name of a company Plaintiff was repairing computers at and another "inaudible" replaced the name of where Plaintiff had been stationed for two weeks. (R. at 222, 223.) See **Ward v. Heckler**, 786 F.2d 844, 848 (8th Cir. 1986) (rejecting claimant's argument that transcript of administrative hearing was not sufficiently complete to ensure fair judicial review and noting that 32-page transcript included, on the average, inaudible, small portions once or twice per page). More importantly, the majority of the "inaudibles" appear when Plaintiff is testifying and both he and his counsel were clearly present throughout the hearing, yet Plaintiff does not indicate what the missing testimony was or how it would have affected judicial review. See **Williams**, 289 F.3d at 558 (finding no need for remand when claimant failed to indicate what material facts were supposedly omitted in inaudible portions or how the missing portions would have affected her case).

Plaintiff's third argument is without merit.

## Conclusion

For the foregoing reasons, the Court finds that there is substantial evidence in the record as a whole, including a consideration of the evidence that detracts from the ALJ's decision, to support the ALJ's conclusion that Plaintiff is not disabled within the meaning of the Social Security Act. Accordingly,

**IT IS HEREBY RECOMMENDED** that the decision of the Commissioner be AFFIRMED and that this case be DISMISSED.

The parties are advised that they have eleven (11) days in which to file written objections to this Report and Recommendation pursuant to 28 U.S.C. § 636(b)(1), unless an extension of time for good cause is obtained, and that failure to file timely objections may result in waiver of the right to appeal questions of fact. See **Griffini v. Mitchell**, 31 F.3d 690, 692 (8th Cir. 1994).

/s/ Thomas C. Mummert, III
THOMAS C. MUMMERT, III
UNITED STATES MAGISTRATE JUDGE

Dated this 30th day of June, 2006.